and John Tomasi on behalf of defendant appellant Christopher Campos. When did appellant Christopher Campos realize that the deal presented to him and which he got his family involved in was part of a fraud? That's how this case turns. I want to address two issues this morning, both of which relate to that one question. First, the government rested its case on the idea that Mr. Campos should have known there was a fraud here simply because he was a lawyer. As I'll explain, that cuts both ways because his experience as a lawyer led him to conclude otherwise. And more importantly, the district court refused to hear the testimony of Christopher Miedo, who was another lawyer, who could have refuted this argument, which again was the linchpin of the government's case. Second, the district court improperly refused to admit into evidence tape recordings that showed Mr. Campos never admitted to fraud, despite the fact that the government was able to introduce tape experts that – tape excerpts that purported to show he admitted to fraud. This is crucial. Let me be clear on that. So with respect to that one, any recordings of your client in which he didn't admit to fraud would be admissible? No, Your Honor. Did you take home movies and put them into evidence because he didn't admit fraud? No, Your Honor. What we sought to admit at the district court level were specific statements in which he denied the fraud, in which he said there was no fraud. Why is that not hearsay? It's not hearsay because the statements in which he purportedly admitted the fraud are equivocal. And if you look at the full tapes in context, or at least the excerpts that we wanted to include, they demonstrate that consistently Mr. Campos told Ms. Austin, who was a government cooperating witness sent to record her conversations with Mr. Campos – You were offering those tapes to show that he was not involved in the fraud, right? We're offering those tapes to show that he never admitted to the fraud, to show that he consistently said, I didn't know there was a fraud here. You were offering them as evidence that he did not engage in the fraud. You were offering them for the truth. Your Honor, we're offering them to show that the tapes that the government introduced, which they claim show he admitted to fraud, aren't the whole story. That he consistently said otherwise and that the out-of-context excerpts that the government sought to introduce and successfully did so aren't the whole story. That he said more than what the government said he said and that if you take the two together, it becomes clear that he admitted no such thing. He did not admit to the fraud. He testified at trial, didn't he? Yes, he did. And I presume he denied that he was part of the fraud at that point. Yes, he did, Your Honor, but what's important here is what the government was able to do at trial was say that at a time when he thought no one was looking, when he was just talking to his quasi-client, Ms. Austin, he admitted to the fraud. That he admitted that he knew all along there was wrongdoing. But what the excerpts that we wanted to include show was that he did no such thing. That he consistently told Ms. Austin that he didn't know at the beginning that there was a fraud. That he learned of the fraud as she did. That, for example, he was led to believe by Mr. Alvarez and Mr. Tavares, particularly Mr. Alvarez, who was an experienced person in the livery industry, and a leading person in that industry who had press articles written about him, had explained to him that this was a legitimate business. He explained that to Ms. Austin in the very same tapes that the government introduced to show that he admitted to the fraud. He knew that the representations made in the loan applications were false. He knew that the cars weren't going to be kept by the loan applicant. He knew that they were going to be used for livery cab purposes, and yet allowed false. He was aware of that, right? He was aware of that, Your Honor. But the thing the government hung its hat on was the idea that they used this false address. That had a very innocent, the whole process had a very innocent feel to it to Mr. Campos. First off. I'm not asking about the false address. You want to answer the false address. Sure. I'm asking you, was he not aware of the false statements contained in loan applications about who was going to be owning the car and driving the car? He was aware of that, Your Honor. Isn't that really the end of the story then? It's not, because the process for taking these cars was much more complicated than that. That was one small step in the whole process. And what's going on here is he is led to believe by Mr. Alvarez that this is a legitimate process. That his experience as a lawyer, including things that Mr. Alvarez reminded him of, in which, for example, multiple family homes are mortgaged based upon not only the credit of the purchaser, but also on the expected revenue from the building. Did he make misrepresentations to car dealership, to a bank? Well, actually, he didn't make any misrepresentations. They were signed by his wife, but yes. His wife did, and he presumably would have inferred that anybody else he arranged to purchase cars would be making the same thing, making the same statements, that they were not going to be keeping the cars. They weren't buying the cars for themselves. This had to have been totally evident from his perspective, right? Your Honor, he fell for it. Okay? It's easy to say that it should be obvious to you, but there was another witness who could have testified, and this is the other part of the argument I wanted to talk about today. Piano came in later after all the cars had been purchased, right? Yes, Your Honor, but he was explained that he certainly would have had access and knowledge about the documentation about those transactions. He could have testified. He wouldn't have done that unless he was brought in to do an investigation about the past. Your Honor, that could have gone to the weight of his evidence. If he had been allowed to testify, he would have testified that he was explained by Mr. Alvarez, or he was informed by Mr. Alvarez about the transactions, how they worked, and what was going on. And he would have had a wellspring of knowledge that was similar to and actually from a better vantage point than our client. And it's... It's similar, but not exactly the same. You know, Your Honor, but... He says it was the same company, and he was working for the same people, but not exactly the same in terms of the knowledge of the fraudulent application, loan applications. Your Honor, that's where cross-examination comes in. What the judge did here is... Because that's what confuses a jury, because he comes in and purports to know what went on, but he doesn't know what went on. In fact, you know, had he been produced, it may have been really devastating for you. Your Honor, we don't know the answer to that question, and we should have, because what he could have done was explain that he was explained and had knowledge of the fraud. He's akin to a second person who has a better vantage point or the same vantage point in a simple car accident case. You know, not just the drivers know whether or not the light was red or green. He was in a position to know whether or not the light was red or green at the time of the accident, and the government and the district court didn't allow him to testify. Now... I thought he came in after the accident. He didn't, actually, Your Honor. He's there at the time this fraud is still continuing to go on, or the fraud that the government proved. But in terms of procuring the cars, that part was completed, and that's the part that, you know, your client can't run away from. No, he can't, but Mr. Miata would have been able to testify about those sorts of things, and the government and the district court denied that opportunity. Thank you, Your Honor. I see my time is up. Thank you. We'll hear from the government. May it please the Court. My name is Sagar Ravi, and I'm Assistant United States Attorney in the Southern District of New York. I represent the government on appeal, and I represent the government in the proceedings below. The district court correctly denied the defendant's motion for a judgment of acquittal based on insufficiency of the evidence, and the district court did not abuse its discretion in precluding two defense witnesses and certain recordings sought to be introduced by the defendant under Rule 106. So I'll turn first to the judgment of acquittal. As Judge Caproni stated in her written decision denying the motion for an acquittal, the evidence at trial overwhelmingly established that Mr. Campos joined and participated in this conspiracy with full knowledge that straw buyers would be used to fraudulently obtain loans. That was an essential part of this scheme. There was ample evidence for the jury to come to that conclusion. Most importantly, the cooperating witness, Mr. Taveras, testified that he told Campos exactly how the scheme would work, that they needed people with enough credit credentials to obtain cars under their own names as opposed to the business, and that they would be purchasing as many as 15 to 20 cars in one single day. Mr. Campos effectively acknowledged before this Court just now that he was aware of those facts and the lies that we made to the bank. In addition, there was also evidence at trial that Campos was there when his wife submitted the applications to the banks, when she bought four cars, and that he reviewed those applications before they were submitted. Those applications contained multiple false statements, including the fact that it was the wife who was buying the cars and not the business, the fact that the cars would be used for personal use rather than a livery cab use. And all of that is certainly sufficient evidence to sustain the verdict here. And finally, after the cars were already completed, Mr. Campos continued to make lies to banks on his own letterhead, lying to banks to cover up the scheme that the cars were actually being held by Susan Austin, one of the straw purchasers, as well as the fact that she was going to be making the payments on the loans when he knew all along that all of that was false. For those reasons, Your Honors, Judge Caproni correctly denied that motion based on the overwhelming evidence on trial. Now, turning to the second issue with respect to Mr. Miado that was raised during the appeal, the proffered areas of testimony by Mr. Campos for Mr. Miado's testimony were completely irrelevant and properly excluded by the district court. As Your Honor acknowledged, Mr. Miado was not at the business at the time that the loan applications were submitted, and, in fact, he was there several months after the fact. And unlike appellate counsel states, there is no proffer in front of the district court as to the fact that Mr. Alvarez explained the way the transactions worked or explained any nature of how this conspiracy worked. In fact, the only proffer that was made was that Mr. Miado would, quote, would testify that after learning about the business, he had no misgivings about his propriety and, indeed, would have considered becoming an investor himself if he had been presented the opportunity, end quote. That's out of Appendix 140. That makes clear that Mr. Miado was never even presented with the opportunity to participate in this, and, therefore, his knowledge as an attorney certainly was very different than Mr. Campos' and was thus properly excluded by the district court. What about the recordings? Yes, I'm turning to that now, Your Honor. Judge Caprone did not abuse her discretion in denying Mr. Campos' motion to omit approximately eight hours of recorded conversations under Rule 106. As an initial matter, as Judge Caprone found, Mr. Campos utterly failed to carry his burden to establish that all eight hours of the recordings were necessary to explain or to contextualize the government's six excerpts, which totaled approximately 30 minutes. In fact, Campos did not even provide the court with a summary of those recordings or even the transcripts of all of those recordings. All he did was argue in a conclusory fashion that there was one continuing conversation between some of the same individuals. This was utterly insufficient, as Judge Caprone found. And the — as this Court is aware, Rule 106 is read very narrowly, and the excerpts that Mr. Campos provided certainly were not necessary to explain the context or explain any of the excerpts the government sought to introduce. The specific argument is that some of the defendant's statements on the tape undermine the government's characterization of some of the other excerpts on the tape. How do you respond to that? Well, I think the government didn't introduce many — most of the recordings the government sought to introduce were with respect to statements by Mr. Campos in the context of, we need to get Ms. Austin's cars paid off, because if they're paid off, that becomes a victimless crime, and no one's going to want to prosecute this, no one's going to be interested in this. And that's the context in which the government sought to argue that the reason he wanted to pay off these cars was so that he wouldn't get caught. Were they paid off, by the way? Several — I think only one was paid off. The remaining 20 were not. Mr. Campos instead cherry-picked other conversations in which he is simply generally describing that he did not commit bank fraud. And by the way, unlike what Appellant Counsel said, this was at a time that Mr. Campos knew he was under — that this whole thing was under investigation by the FBI. And so that — that also lends itself to undermine his statements there as simply self-serving hearsay testimony, which this Court has excluded several times under Rule 106. So unless the Court has other questions, the government rests on submission. Thank you. We'll hear the rebuttal. A few points in rebuttal, Your Honor. First off, contrary to what the government's counsel has just stated, there was a proffer as to what Mr. Miata would say. It's in the record at JA 140. There's a letter from my colleague Lee Vartan from his then firm Holland & Knight in which he describes what Mr. Miata would testify to.  How is that relevant, that he had no misgivings about the proprietor? It goes back to what we talked about during my main argument. He's there. He knows the people. He's involved. He wasn't there. He wasn't there at the same time the defendant was. And that's when, you know, apart from what the defendant knew about the overall scheme, he was, I think it's been pointed out and you've conceded that he knew about the fraudulent loans, the false statements in the loans. And Miata wasn't there at that time. Your Honor, there are two responses to that. First off, he testified at trial that he didn't read the loan applications on the day they were signed. Okay? And so the idea that he would have known exactly what was written in the loan applications is something that the record will speak for itself on. But more importantly, when Mr. Miata was at the office of Mr. Alvarez, he saw the same presentation that Mr. Campos saw, which was, among other things, prominent publications in the livery industry which showed Mr. Alvarez as a successful businessman. Wait. Did they say that he became successful by utilizing straw purchasers for automobiles, that he falsely told banks were going to be used under livery purposes? No, Your Honor. For personal purposes? No, Your Honor. But this was not Mr. Campos' business. This was not an industry he had familiarity with. He relied upon someone he thought was successful in that industry and was an expert. And he had reason to believe so, and that's why there was not knowledge of fraud. Look, that's your argument to the jury. The jury didn't buy it, but there certainly was enough evidence in the record, right, that would support a jury conclusion that when you have these many false facts staring you in the face, that's indicia of crime and you have knowledge. We disagree, Your Honor. And more importantly, had Mr. Miata been allowed to testify, there was also another witness, a car broker, who was not allowed to testify. And one of the most damning things at the trial, if you read the record, was the context that Mr. Miata admitted that he knew about the fraud all along. And had the excerpts that the defense wanted to play been allowed to be played, they would have shown that in proper context he admitted no such thing. Thank you, Your Honor.